# Def.'s Ex. 3

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEMOR S. SHARIFI,                          )
                                           )
                                           )     No. 16-1090 L
            Plaintiff,                      )
                                           )     Judge Victor J. Wolski
      v.                                    )
                                           )     *Electronically filed on April 10, 2017*
UNITED STATES OF AMERICA,                   )
                                           )
            Defendant                       )
_____ )

## DECLARATION OF WALTER A. REED

I, Walter A. Reed, make the following declaration:

1. I am over the age of 18 and legally competent and capable of making this Declaration. I have personal knowledge of the facts contained in this Declaration.

2. I am currently a Major in the United States Army assigned to the Pentagon.

3. I served on active duty in the United States Army for 14 years. During that time, I deployed with 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division in support of the International Security Assistance Force (ISAF) as the Company Commander of C Company. I served in that position from June of 2009 until June 2011. I was responsible for conducting population-focused counterinsurgency operations in the Southwestern portion of the Arghandab River Valley. Additionally, I was responsible for training, mentoring, and partnering with one Company of the Afghan National Army and unit PSS-13 of the Afghan National Police. During my time in the Southwestern portion of the Arghandab River Valley, the ISAF forces in there were composed of U.S. forces under the direction of ISAF.

4. Prior to the establishment of COP Millet, the unit we replaced, the 82nd Airborne Division (82nd ABN), was utilizing abandoned buildings within Deh-e-Kowchay. Deh-e-Kowchay is a small village located in an area near a key river crossing that was strategically important to Afghan security forces and other allied forces, as well as important to enemy combatants and criminal elements.

5. During my time in Deh-e-Kowchay, both before and after the establishment or COP Millet, U.S. and Afghan forces worked together to secure the area. While the 82nd ABN was located within Deh-e-Kowchay, there were multiple improvised explosive device (IED) and vehicle borne IED (VBIED) attacks against U.S. and Afghan forces that killed one U.S. soldier and destroyed the building used by U.S. and Afghan forces.

6.  The area where COP Millet was eventually established consisted of a large field and five abandoned buildings, located approximately 250 meters southwest of Deh-e-Kowchay.  The abandoned buildings were being utilized by the Taliban as a warehouse for IED materials.  Both U.S. and Afghan forces attacked and eventually destroyed the buildings, despite resistance from the Taliban forces.  The abandoned buildings were reduced in October or November 2010, but enemy supplies were still contained in the rubble of those buildings.  The field also posed an IED threat, predominantly in the form of pressure plate IEDs, which killed one U.S. soldier in August 2010.  There was no farming being done on the field at that time due to the IED and Taliban threat.

7.  In October 2010, I made a recommendation to my battalion commander, LTC Rodger Lemons, that a COP be established in the area of the large field described above for tactical reasons.  LTC Lemons and the Afghan National Army commander on the ground were in complete agreement as to the necessity of this course of action to eliminate or greatly diminish the Taliban threat.

8.  Before establishing COP Millet for the U.S. and Afghan forces, I did some preliminary research into who owned the field where both Afghan and U.S. forces wanted to build COP Millet.  The villagers worked the land in a sharecropper status, and the actual land owner or owners were unknown.  I met with two individuals about the land and its ownership, though I do not remember their names.  Through an interpreter, I communicated that I had no authority to bind the U.S. government in either a lease or an offer to purchase the land.  I stated that I was only trying to learn who would be affected by building a COP.  The two individuals immediately wanted to talk about money.  I responded that they needed to prove to the proper official in the Arghandab District government that they owned the land because the land was committed to use by U.S. and Afghan forces by the Arghandab District government.  Fraud involving real property in that area was a known concern during this time period.

9.  In preparation to establish COP Millet, the government of Afghanistan warranted to the United States Army in a License for Construction agreement dated October 18, 2010 (attached as Exhibit A), that the government of Afghanistan was "the rightful and legal owner" of the land where we intended to build COP Millet.  The attached exhibit was one of the approval documents required before building the COP, which document the U.S. Army retained in the normal course of business.  I recognize Exhibit A to be a true and accurate copy of License for Construction agreement.  With this understanding allied forces erected COP Millet in approximately one week, and it was completed sometime prior to Thanksgiving 2010.  The site was secured by a combined team of Afghan National Army, Afghan National Police, and ISAF elements during construction.  ISAF engineers de-mined the area and cleared it for occupation, and local Afghan contractors executed the majority of the work on the COP.

10.  COP Millet consisted of HESCO barriers, a ditch, and gravel.  HESCO barriers are large heavy duty fabric bags placed inside a wire mesh container, which are usually filled with sand and small stones and are used to provide a temporary blast and bullet resistant barrier. They come in different sizes, but the HESCO barriers used at COP Millet were approximately 8 feet high and between 3 and 6 feet thick.  There were also concrete T-walls at the entrance.  There

may have also been an ablution unit built for the Afghan forces present at COP Millet. The soldiers slept in tents inside the perimeter of the HESCO barriers. There was also a trailer mounted camera system and a removable kitchen trailer. There were no permanent structures and minimal life support. The portion of the COP used for the Afghan National Army unit was built before the U.S. portion. During my command, COP Millet became large enough to house both a U.S. Army platoon of around 28-30 soldiers, as well as an Afghan platoon of around 40 soldiers for increased force protection purposes. Life at COP Millet was austere.

11.   From a strategic standpoint, COP Millet provided the combined U.S. and Afghan military and police forces an outpost near Deh-e-Kowchay, but allowed the villagers the freedom to move about their village without direct interference from ISAF or Afghan military force protection measures. COP Millet was intended to be used as a patrol base from which soldiers could patrol the sector. U.S. and Afghan National Army forces were also there to ensure that Taliban elements did not use the surrounding orchards and fields as a support and logistics zone to facilitate attacks from the Arghandab District into Kandahar City.

12.   Around November 2010, a permanent Afghan police presence was assigned to Deh-e-Kowchay. The introduction of Afghan police forces into the village at the same time that the U.S. and Afghan military forces were moving into COP Millet was favored by the villagers. A police check-point was erected where the main road came off of the river. The check-point was manned by three Afghan National Police and was intended to ensure vehicles and personnel did not use the river crossing at Deh-e-Kowchay to get into Kandahar City.

13.   U.S. Army, Afghan National Army, and Afghan National Police forces were all necessary in supporting the overall strategy of controlling cross-river traffic while clearing the surrounding areas of Taliban seeking to influence Kandahar City.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the forgoing is true and correct.

Executed this _28_ th day of _March_ 2017.

Walter A. Reed

3

# Exhibit A



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, 1ST BATTALION, 66TH ARMOR REGIMENT
1TH BRIGADE COMBAT TEAM, 4TH INFANTRY DIVISION
KANDAHAR, AFGHANISTAN, APO AE 09355

AFYB-BCA-CCO                                               18 October 2010

LICENSE
FOR
CONSTRUCTION

MGRS 41R QR 4862 0248
MGRS 41R QR 4859 0255
MGRS 41R QR  4868 0226
MGRS 41R QR  4872 0258
Property Identifier

**Combat Outpost Millet**
Project Name

The **GOVERNMENT OF THE ISLAMIC REPUBLIC OF AFGHANISTAN** (hereafter
"HOST NATION") grants to the **UNITED STATES OF AMERICA** (hereafter 'UNITED
STATES"), an irrevocable right to enter upon the lands hereinafter described and consents to
officers, employees, and authorized representatives (including contractors) of the United States
Army entering and having continued access to said property at any time within a period of one
year (365 days) from the date of this instrument, in order to establish a permanent combat outpost
outside of Deh-e-Kowchay to alleviate the strain on the population caused by the current
Combat Outpost and to support continued security gains in the Arghandab River Valley. GIRoA
District Governor of Arghandab District wants to buy 300 by 300 meters of land near Deh-e
Kowchay between property identifiers MGRS 41R QR 4862 0248, MGRS 41R QR QR4859
0255, MGRS 41R QR4868 0226, and MGRS 41R QR 4872 0258 for a fair price. Upon purchase
we will move the necessary establishments to new boundary line. With the following terms and
conditions:

1. This License includes the right of entry and egress upon the specified area of the HOST
NATION, as described in Exhibit A, provided such entry is necessary in connection with the
activities being conducted under this License and are not otherwise conveniently available to the
UNITED STATES.

2. All tools, equipment, and other property taken upon or placed upon the land by the
UNITED STATES shall remain the property of the UNITED STATES and may be removed by
the UNITED STATES at any time within a reasonable period after the expiration of this License,
unless and until such property is designated for transfer to the HOST NATION.

3. The UNITED STATES shall have the right to maintain site security over the lands
Hereinafter described to protect all tools, equipment, and other property taken upon and placed on
such lands during the period of this License and until the UNITED STATES removes its
property.

4. The HOST NATION warrants that it is the rightful and legal owner of the herein
described premises and has the legal right to enter into this License. If the title of the HOST
NATION shall fail, or it be discovered that the HOST NATION did not have authority to issue
this License the UNITED STATES shall have the option to terminate this Right-of-Entry and the
HOST NATION agrees to indemnify the UNITED STATES by reason of such failure. Nothing

contained in this agreement may be considered as implying that Congress will at a later date appropriate funds to remedy any latent deficiencies.

5. No notice, order, direction, determination, requirement, consent or approval under this License shall be of any effect unless it is in writing. Notice will be deemed given and received: (i) if hand delivered to a party at the location specified below, against receipted copy, or (ii) if by e mail or facsimile transmission, to the specified e mail or fax number below, with acknowledgment of receipt.

a. Written communications to the UNITED STATES shall be delivered by hand or electronic transmission such as e mail or facsimile transmission:

CPT David Zallo BN FSO

david.zallo@afghan.swa.army.smil.mil

SVoIP 672-8035

b. Written communications to the HOST NATION shall be delivered by hand or electronic transmission such as e mail or facsimile transmission:

District Governor Haji Shaw Mohammed

Arghandab District OCC- D

6. It is understood and agreed that the UNITED STATES does not acquire title or any other interest in said land by means of this grant of permission and consent to enter the subject land of the HOST NATION during the term of this License, or any renewal thereof.

7. This written permission is given by the undersigned voluntarily, without coercion and without promises of any kind not herein provided for.

8. The land affected by this License is located outside of the village of Deh-e-Kowchay, the Government of the Islamic Republic of Afghanistan and is described in Exhibit A and depicted on the map at Exhibit B.

9. At the expiration or earlier termination or revocation of this License, the UNITED STATES will vacate the land affected by this License, remove any of its property there from, and perform a joint close-out inspection of said land with the HOST NATION. After performing the joint inspection, the parties will sign a release evidencing the termination of this License. The UNITED STATES will not be responsible for any restoration of said land arising from or related to the occupancy, use, and alteration of said land.

WITNESS MY HAND AND SEAL this _____ day of_____ 20___.

_____

GOVERNMENT OF THE ISLAMIC REPUBLIC OF AFGHANISTAN

_____

THE UNITED STATES OF AMERICA

_____

Owner Of Land