# In the United States Court of Federal Claims

No. 16-1090
Filed: July 11, 2019

| | |
|---|---|
| TEMOR S. SHARIFI,<br><br>                  Plaintiff,<br><br>     v.<br><br>THE UNITED STATES,<br><br>                  Defendant. | Takings Clause; Act of State Doctrine; Real Property; Cognizable Property Interests; Foreign Law. |

*Carolyn L. Gaines*, Philadelphia, PA, for plaintiff.

*Edward Carlos Thomas, IV*, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for defendant.

## OPINION

**FUTEY**, *Senior Judge*

This case is before the Court on defendant's motion to dismiss plaintiff's amended complaint ("Am. Compl."), which was filed on February 15, 2017, pursuant to rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). Defendant filed its motion on April 10, 2017. Plaintiff filed a response on May 11, 2017, and the defendant filed its reply on May 30, 2017. After hearing oral argument on the motion, the Court ordered supplemental briefing. Defendant filed its supplemental brief on October 24, 2017, and the plaintiff filed a response on November 21, 2017.

The plaintiff, a United States citizen, seeks damages for a taking of real property by the United States in Afghanistan. In its motion to dismiss, the defendant makes four arguments: First, the defendant argues that the United States may not be held liable for a taking carried out

by an international military coalition. Second, the defendant argues that plaintiff's lawsuit is barred by the act of state doctrine. Third, the defendant urges dismissal because plaintiff has failed to "identify the specific property interest alleged to have been taken by the United States" as required by RCFC 9(i). Lastly, the defendant argues that plaintiff has not shown he is the owner of the land.

The matter is now ripe for disposition.

## I.   BACKGROUND

### a.  Factual Background[1]

The amended complaint alleges as follows: Approximately 100 years ago, plaintiff's grandfather—Haji Mohammad Sharif—acquired 38 jeribs[2] in Deh-e-Kowchay, Arghandab District, Kandahar in Afghanistan. ECF No. 10 ("Am. Compl.") ¶¶ 4–5. Plaintiff's grandfather then allegedly passed the land down to plaintiff's father—Haji Abdul Ghafur Khan. *Id.* ¶ 6. In April 2004, after plaintiff's father died, plaintiff and his siblings entered into an agreement to subdivide the land. *Id.*; *see also id.* Ex. A (inheritance agreement).[3] Plaintiff then leased his land to a tenant, who used it for farming. *Id.* ¶ 10.

In October 2010, Walter A. Reed—a United States Company Commander— recommended that the United States Army ("U.S. Army") establish a command outpost near

---

[1] Specific dates for events are provided, except where the amended complaint specifies only to the nearest month and no primary document bearing the applicable date has been filed. *See, e.g.*, Am. Compl. ¶ 16.
[2] A jerib is a "unit of land measurement equivalent to 2,000 square metres or one fifth of a hectare." Liz Alden Wily, *Land, People, and the State in Afghanistan 2002–2012*, Afg. Res. & Evaluation Unit, at 2 (Feb. 2013).
[3] Defendant disputes the legal effectiveness of plaintiff's inheritance agreement as well as his proof of land ownership. *See* Gov't Ex. 6. The Court addresses those arguments later in this Opinion.

Deh-e-Kowchay. Gov't Ex. 3. Commander Reed investigated ownership of the field where the U.S. Army wished to construct an outpost, but the identity of the owner or owners was "unknown." *Id.* Plaintiff alleges that Commander Reed then met twice with plaintiff's brother to discuss the possibility of leasing plaintiff's land. Am. Compl. ¶¶ 7–8.[4] At some point, plaintiff instructed his brother not to return to the U.S. Army base where he had met with Commander Reed "for security purposes and to protect his family." *Id.* ¶ 11.

On October 18, 2010, the government of Afghanistan granted the U.S. Army a one-year "License for Construction" (hereinafter "license" or "license agreement") to build a combat outpost. Gov't Ex. 3. The license applies to land "outside the village of Deh-e-Kowchay . . . described in Exhibit A and depicted on the map at Exhibit B."[5] *Id.* The license "warrants that [the government of Afghanistan] is the rightful and legal owner of the herein described premises." *Id.* The license also provides that, "If the title of the [government of Afghanistan] shall fail, or if it be discovered that the [government of Afghanistan] did not have authority to issue this License the [United States] shall have the option to terminate this Right-of-Entry and the [government of Afghanistan] agrees to indemnify the [United States] by reason of such failure." *Id.*

---

[4] Then-Commander (now-Major) Reed remembers these conversations differently. According to Commander Reed, he communicated to two individuals "that [he] had no authority to bind the U.S. government in either a lease or an offer to purchase the land." Gov't Ex. 3. Commander Reed also informed his counterparties that "they needed to prove to the proper official in the Arghandab District government that they owned the land because the land was committed to use by U.S. and Afghan forces by the Arghandab District government." *Id.* At this early stage, the Court may not wade into these factual disputes and accepts plaintiff's allegation that Commander Reed expressed some interest in leasing the land from its owner. *See Athey v. United States*, 908 F.3d 696, 705 (Fed. Cir. 2018) ("The court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant.").

[5] The defendant did not include either "Exhibit A" or "Exhibit B" in its submissions to this Court, so the precise geographic scope of the license is unclear.

The license also appears to contemplate a future acquisition of additional land by the District Governor of Arghandab ("District Governor"). *Id.* It goes on to state, "Upon purchase we will move the necessary establishments to new boundary line." *Id.* Whether such an acquisition—or corresponding adjustment in boundary lines—ever took place is unclear.

The signature block of the license indicates that one individual signed on behalf of the "Government of the Islamic Republic of Afghanistan," and another individual signed on behalf of "The United States of America." *Id.* A third line, labeled "Owner of Land," is blank. *Id.*

In October and November 2010, the U.S. Army, the Afghan National Army, the Afghan National Police, private contractors, and other elements of the International Security Assistance Force ("ISAF")[6] built Combat Outpost Millet ("COP Millet"). Gov't Ex. 3.

The plaintiff later discovered that the U.S. Army had demolished houses and trees to construct COP Millet. Am. Compl. ¶¶ 9, 14. He telephoned Commander Reed with the intent to provide proof of ownership. *Id.* ¶ 12. Plaintiff also spoke with other U.S. Army personnel. *Id.* ¶ 13.

On December 7, 2010, plaintiff wrote a letter to the Governor of Kandahar ("Governor") requesting compensation for the U.S. Army's occupation of his land. *Id.* Ex. A. On January 3, 2011, the Governor referred plaintiff's request to the District Governor. *Id.* The District Governor responded by verifying that Haji Mohammad Sherif (plaintiff's grandfather) owned the land in question. *Id.*

---

[6] The United Nations Security Council formed the ISAF on December 20, 2001 "to assist the Afghan Interim Authority in the maintenance of security in Kabul and its surrounding areas, so that the Afghan Interim Authority as well as the personnel of the United Nations can operate in a secure environment." U.N. Docs. S/RES/1386 (Dec. 20, 2001).

On June 3, 2012, plaintiff wrote a letter to the District Governor again requesting compensation. *Id*. Plaintiff also petitioned the Governor asking for assistance. *Id.* On July 17, 2012, the Governor again referred plaintiff's request to the District Governor. *Id.* Sometime thereafter, the District Governor responded that the U.S. Army had taken the property in question but had not paid rent or other compensation.[7] *Id.*

In September 2012, then-Commander Barry F. Huggins executed a "Statement of Intent for the Transfer of COP Millet." Gov't Ex. 5. The statement memorialized the ISAF's intent to turn over COP Millet to the Afghan Uniform Police on September 25, 2012. *Id.* The statement bears Huggins's signature, in his capacity as a Colonel in "2/2 SBCT."[8] *Id.*

In December 2012, plaintiff filed a complaint with the United States Department of Defense but did not receive a response. Am. Compl. ¶ 16. On December 12, 2016, plaintiff sent a letter to the District Governor, together with a sketch of plaintiff's land, asking that the District Governor verify plaintiff's ownership. *Id.* Ex. A. The District Governor responded by verifying plaintiff's ownership. *Id.*

   b.  **Procedural Background**

On August 31, 2016, plaintiff filed a complaint in this Court. ECF No. 1. On October 24, 2016, defendant filed a motion for a more definite statement pursuant to RCFC 12(e). ECF No. 5. On November 10, 2016, plaintiff filed a response, and on November 21, 2016, defendant filed

---

[7] It is not clear if the District Governor was aware of the existence of the license agreement.
[8] "2/2 SBCT" stands for 2nd Stryker Brigade Combat Team, 2nd Infantry Division. *See* Gov't Ex. 5.

5

a reply. ECF Nos. 6, 7. On February 1, 2017, the Court granted defendant's motion for a more definite statement and directed plaintiff to file an amended complaint. ECF No. 8.

On February 15, 2017, plaintiff filed an amended complaint. ECF No. 10. The amended complaint requests $1,400,000.00, plus interest, as just compensation for the taking of plaintiff's property. Am. Compl. ¶ 19. The amended complaint also requests costs and attorney's fees. *Id.*

On April 10, 2017, defendant filed a motion to dismiss ("Gov't Mot."), together with accompanying exhibits and declarations ("Gov't Ex. 1–6"). ECF No. 13. On May 11, 2017, plaintiff filed a response ("Pl.'s Resp."), and on May 30, 2017, defendant filed a reply ("Gov't Reply"). ECF Nos. 14, 15.

On September 19, 2017, the Court heard oral argument on the defendant's motion ("9/19/17 Tr."). ECF No. 19. That same day, the Court ordered supplemental briefing "addressing *Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953), as well as the relevant laws of Afghanistan." ECF No. 17.

On October 24, 2017, defendant filed a supplemental brief ("Gov't Supp. Br."), and on November 21, 2017, plaintiff filed a response ("Pl.'s Supp. Br."). ECF Nos. 23, 24. On December 1, 2017, plaintiff moved for leave to file additional exhibits with his supplemental brief. ECF No. 25. On December 4, 2017, the Court granted the motion to file additional exhibits. ECF No. 26.

On July 10, 2018, the Court again heard oral argument on the motion to dismiss ("7/10/18 Tr."). ECF No. 32. On May 3, 2019, the case was transferred to the undersigned. ECF No. 33.

## II. DISCUSSION

The defendant moves to dismiss the amended complaint for four independent reasons. First, defendant argues that the United States may not be held liable for a taking carried out by the ISAF and/or the government of Afghanistan. Gov't Mot. at 6–8. Second, defendant argues that plaintiff's lawsuit is barred by the act of state doctrine. *Id.* at 8–10. Third, defendant urges dismissal because plaintiff has failed to "identify the specific property interest alleged to have been taken by the United States" as required by RCFC 9(i). *Id.* at 10–12. Lastly, defendant argues that plaintiff has not shown he is the owner of the land identified in the amended complaint. *Id.* at 12–17. The Court addresses each of these arguments in turn.

### a. Legal Standard

Rule 12(b)(6) permits a party to file a motion to dismiss for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if true, would state a claim to relief that is plausible on its face." *Athey*, 908 F.3d at 705 (internal quotations omitted). "The court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Id.*

The Fifth Amendment provides that "private property" may not be "taken for public use, without just compensation." U.S. Const. amend. V. "To state a claim for a taking, [plaintiffs] must establish: (1) that they had a cognizable property interest, and (2) that their property was taken by the United States for a public purpose." *Alimanestianu v. United States*, 888 F.3d 1374, 1380 (Fed. Cir. 2018).

"Takings claims typically come in two forms: *per se* or regulatory." *Id.* "To find a *per se* taking, there must be either a permanent physical invasion, or a denial of all economically viable uses of the property." *Id.* (citations omitted). "When the Government commits a *per se* taking, it has a categorical duty to pay just compensation." *Id.* "A regulatory taking involves a restriction on the use of property that [goes] 'too far.'" *Id.* (internal quotations omitted) (modification in original). "To determine whether a Government action goes 'too far,' courts have traditionally utilized a three-pronged factual inquiry illuminated by *Penn Central Transportation Co. v. City of New York*, which looks to: 'the character of the governmental action,' 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and '[t]he economic impact of the regulation on the claimant.'" *Id.* at 1380–81 (modification in original).

The amended complaint appears to allege a *per se* taking. *See* Am. Compl. ¶ 9 ("houses and trees" were "demolished"). The Court, however, does not need to decide which legal framework applies at this stage because none of defendant's arguments for dismissal turns on the *per se* versus regulatory distinction.

### b. The United States May Have Taken Private Property to Construct Combat Outpost Millet

The defendant argues the United States is not liable, because the construction of COP Millet was carried out by the ISAF together with the government of Afghanistan. Gov't Mot. at 6–8. Plaintiff responds that the United States took his property, as evidenced by the license between the United States and the government of Afghanistan. Pl.'s Resp. at 3–5.

In support of its position, defendant invokes *Standard-Vacuum Oil Co. v. United States*, 153 F. Supp. 465 (Ct. Cl. 1957), for the proposition that the United States cannot be held liable

for takings committed by international military coalitions, even if the United States is a member of that coalition. Gov't Mot. at 7.

*Standard-Vacuum* dealt with the status of certain property in Japan after World War II. During the war, the Japanese government seized the plaintiff's property. 153 F. Supp. at 465. After the Japanese government surrendered, the Supreme Commander for the Allied Powers established procedures for individuals like the plaintiff to recover seized property. *Id.* at 466. The plaintiff then filed requests in accordance with those procedures. *Id.* In response, the Supreme Commander for the Allied Powers directed the Japanese government to restore title to the plaintiff, but temporarily retained possession of some items that were being used by occupation forces. *Id.*

The Court of Claims held that "all action taken was by the Supreme Commander for the Allied Powers, not by the United States." *Id.* On that basis, the court held that "[t]here was no taking by the United States and thus the Government is not liable under the [F]ifth [A]mendment." *Id.* "To hold otherwise," the court reasoned, "would be to open the door to claims of not only citizens but noncitizens alike for all occupancy by the Allied Powers, thus causing the United States to bear almost the entire financial burden, not only of the war but also of the peace." *Id.* at 466–67.

In response, plaintiff relies on *Turney*, the case this Court asked the parties to address in supplemental briefing. *Turney* dealt with a takings claim arising out of the disposal of military surplus in the Philippines after World War II. The facts are complex; suffice to say that a central question in the case was whether the United States was responsible for a taking carried out by the government of the Philippines when it imposed an embargo on the export of certain radar equipment. 115 F. Supp. at 463. The Court of Claims held that the United States was liable,

9

because "relations, at the time, between our Government and the Philippine Government, were close." *Id.* As evidence of close relations, the Court of Claims cited the following facts:

> Our armed forces had just liberated the Philippines from the Japanese. Our Government had given one hundred million dollars worth of surplus property to the Philippines, including the property at the Leyte Air Depot, and had sold the property for the account of the Philippine Government. When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied. That put irresistible pressure upon the corporation to come to terms with the United States Army, the terms being that the radar equipment would be segregated in charge of the Army and would not be disposed of until a final agreement was reached as to its disposition. The final agreement turned the property back to the Army in exchange for a receipt, and with a reservation of the right to sue for its value.

*Id.* at 463–64.

In their supplemental briefs, the parties debate whether *Standard-Vacuum* or *Turney* is more analogous to this case. *See* Pl.'s Supp. Br. at 1–4; Gov't Supp. Br at 3–6. But neither party analyzes the facts using the Federal Circuit's more recent test for whether the United States is liable for takings committed by international entities. *See Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297, 299 (Fed. Cir. 1987).

"One seeking just compensation from the United States for actions of an international organization must show 'sufficient direct and substantial United States involvement.'" *Id.* (quoting *Langenegger v. United States*, 756 F.2d 1565, 1571 (Fed. Cir. 1985)). "That required showing depends on the sum of two factors: (1) the nature of the United States' activity, and (2) the level of benefit the United States has derived." *Id.*

The plaintiff has alleged facts that, if proven, would show the United States was involved in the construction of COP Millet to a sufficient degree to find a Fifth Amendment taking. The United States was a signatory to the license agreement with the government of Afghanistan that

authorized entry onto the land in question. Gov't Ex. 3. And, the United States derived a clear benefit from that license agreement; namely, the ability to construct COP Millet as housing and protection for its forces. *See id.* ("COP Millet was intended to be used as a patrol base from which soldiers could patrol the sector.").

The defendant's reliance on *Standard-Vacuum* assumes the United States was acting as a mere agent of the ISAF when it entered into the license agreement. In fact, however, no mention of the ISAF appears on the license. Gov't Ex. 3. Defendant asks the Court to take notice of the fact that on July 31, 2006, the ISAF took command of the southern region of Afghanistan, including Kandahar. Gov't Mot. at 7 (citing *ISAF's mission in Afghanistan (2001-2014) (Archived)*, NATO (updated Sept. 1, 2015), *available at* https://www.nato.int/cps/en/natohq/topics_69366.htm). Assuming the information on the NATO website is accurate, the ISAF's leadership role in Kandahar at the time of the alleged taking does not exclude the possibility of independent activities undertaken by the United States. *Cf. Progress toward Security and Stability in Afghanistan*, U.S. Dept. of Defense, at 27 (Jan. 2009), *available at* https://dod.defense.gov/Portals/1/Documents/pubs/OCTOBER_1230_FINAL.pdf ("U.S. forces are deployed to Afghanistan either as part of Operation Enduring Freedom (OEF), or the [ISAF]."). Drawing all reasonable inferences in plaintiff's favor, a reasonable fact-finder could find that the United States entered into the licensing agreement on its own behalf, even if it did so to facilitate the construction of COP Millet by the ISAF. Consequently, plaintiff has plausibly alleged that the United States was directly and substantially involved in the taking of the disputed land.

In its reply brief, defendant argues that—during the relevant time period—United States forces in Kandahar operated exclusively under the direction of the ISAF. Gov't Reply at 4; Gov't

Supp. Br. at 4. That argument may carry the day at summary judgment but, at this stage, would require fact-finding that is inappropriate in evaluating a motion to dismiss. *See Athey*, 908 F.3d at 705; *see also Glob. Freight Sys. Co. W.L.L. v. United States*, 130 Fed. Cl. 780, 789 (Fed. Cl. 2017) (denying a motion to dismiss because the question of "'direct and substantial [United States] involvement' requires a factual assessment which cannot be made on the basis of the allegations at this early stage of litigation").

The defendant's other arguments on the question of the United States' involvement are insufficient to justify dismissal. For example, defendant argues that Afghanistan should be liable for any taking because COP Millet was constructed "with the full knowledge and support of the Afghan government." Gov't Mot. at 7. That is not the law. In *Turney*, there was no doubt that the United States took the plaintiff's property with the full knowledge and support of the government of the Philippines, but the Court of Claims nevertheless found the United States liable. *See* 115 F. Supp. at 463.

The defendant next argues that "the Afghan forces stationed at COP Millet outnumbered the ISAF forces," and that "Afghanistan "has been [] the sole occupant [of COP Millet] since September 2012." Gov't Mot. at 7–8. But, "[i]t is [] an accepted principle that it is not essential for the government to have taken property for its own use for a taking to be found." *Langenegger*, 756 F.2d at 1570 (citing *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984)). The United States may not take property and subsequently avoid its obligation to pay just compensation by placing that property at someone else's disposal.

    **c. The Act of State Doctrine Does Not Bar Plaintiff's Claims**

The act of state doctrine bars United States courts "from declar[ing] invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Envtl.*

12

*Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). It is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs[.]" *Id.* at 404 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)). "Under that doctrine, the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Republic of Austria v. Altman*, 541 U.S. 677, 700 (2004). The party asserting the applicability of the act of state doctrine bears the burden of proof. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694–95 (1976); *see also Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).

In *Kirkpatrick*, the Supreme Court made clear that the act of state doctrine "is not some vague doctrine of abstention but a '*principle of decision* binding on federal and state courts alike.'" *Kirkpatrick*, 493 U.S. at 406 (original emphasis) (quoting *Sabbatino*, 376 U.S. at 427); *see also Kashef v. BNP Paribas S.A.*, 2019 WL 2195619, at *4 (2d Cir. May 22, 2019) ("[The act of state doctrine] is not a categorical rule of abstention that prohibits courts from deciding cases or controversies whenever issues of foreign relations arise."). "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Kirkpatrick*, 493 U.S. at 406 (original emphasis). In addition, even if the doctrine is technically available, there are instances when "the policies underlying the act of state doctrine may not justify its application" and it should not be invoked. *Id.* at 409; *see also Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1072–73 (9th Cir. 2018) ("The Supreme Court has indicated that even when the two mandatory elements [of the act

of state doctrine] are satisfied, courts may appropriately look to additional factors to determine whether application of the [] doctrine is justified."). In *Sabbatino*, the Supreme Court articulated three possible factors that may weigh against application of the doctrine:

> [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence . . . for the political interest of this country may, as a result, be measurably altered.

*Sabbatino*, 376 U.S. at 428 (cleaned up).

The defendant argues that the act of state doctrine bars the Court from adjudicating plaintiff's claim, because finding for plaintiff would require the Court to invalidate the license agreement, within which the government of Afghanistan represented that "it is the rightful and legal owner of [the property] and has the legal right to enter into this License." Gov't Ex. 3. Defendant contends that, because "a threshold issue in a Fifth Amendment takings case is whether a plaintiff owns the land allegedly taken," for the Court to rule for plaintiff, it would have to invalidate the license agreement. Def. Mot. at 9; Def. Reply at 6.

The plaintiff responds that the act of state doctrine does not apply, because it "is not seeking to invalidate the actions of a foreign sovereign." Pl. Resp. at 6. In addition, the license is ambiguous as to whether the Afghan government did warrant it owned the land. *Id.*

The Court does not decide whether the act of state doctrine applies, because, assuming that it does, defendant has not met its burden to show that the policies underlying the doctrine justify its application in this case. *See Alfred Dunhill*, 425 U.S. at 694–95; *see also Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 350 (C.D. Cal. 1997) ("When applying the *Sabbatino* test, the party asserting the applicability of the act of state doctrine bears the burden of proof.").

*Sabbatino*'s first factor cautions against applying the doctrine when there is a high "degree of codification or consensus concerning a particular area of international law[,]" so that a court need not focus "on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice." 376 U.S. at 428 (cleaned up). Defendant has offered nothing suggesting how international law and international justice are implicated by the Court ruling on a takings claim against the United States by a United States citizen, albeit on foreign soil.

Similarly, regarding the second *Sabbatino* factor, defendant has not shown the importance of the implications, if any, on United States foreign relations of potentially finding the license agreement invalid. Indeed, the fact that the license itself contemplates that the government of Afghanistan "did not have authority to issue this License" in the indemnity clause, Gov't Ex. 3, and the alleged fact, which the Court at this stage accepts as true, that the District Governor verified that plaintiff's grandfather owned the land in question, Am. Compl. Ex. A., suggest that potentially finding the license agreement invalid does not have meaningful foreign policy implications.

As to the third *Sabbatino* factor, while the government of Afghanistan is still in existence, this alone does not warrant applying the act of state doctrine. *See Unocal*, 176 F.R.D. at 353–54

(finding that, despite the foreign government's continued existence, "the balance [of the *Sabbatino* factors] weighs against invocation of the act of state doctrine"). Because defendant has failed to prove that "passing on the validity" of the license agreement may "hinder the conduct of foreign affairs" the Court declines to invoke the act of state doctrine. *Kirkpatrick*, 493 U.S. at 405 (citations omitted).

### d. Plaintiff has Failed to Plead Ownership of the Disputed Land

To claim a Fifth Amendment taking, a plaintiff must show "a cognizable property interest." *Alimanestianu*, 888 F.3d at 1380; *see also Acceptance Ins. Companies, Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) ("First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking."). "The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003). "Instead, 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)). In this case, the independent source of law that plaintiff invokes is the law of Afghanistan.

Rule 44.1 of this Court states, "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." RCFC 44.1. The purpose of Rule 44.1 is "to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so." *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865,

1873 (2018) (quoting 9A Alan Wright et al., *Federal Practice & Procedure* § 2444 (3d ed. updated Apr. 2019)) (describing the identically-worded Rule 44.1 of the Federal Rules of Civil Procedure).

The defendant contests the validity of plaintiff's property interest in two ways. First, defendant challenges the validity of plaintiff's proof of ownership. Gov't Mot. at 12–15. Second, defendant challenges the effectiveness of plaintiff's inheritance agreement with his siblings. *Id.* at 15–16. The Court begins with the first issue, plaintiff's proof of ownership.

The Court proceeds cautiously, mindful of the fact that it is "very difficult to determine . . . the legitimate owners of land and property in Afghanistan," and that "for much of Afghanistan's recent history people have had no alternative but to use customary documents to validate land and property transfers as there has been no functioning official judicial system." Conor Foley, *A Guide to Property Law in Afghanistan*, Nor. Refugee Council, at 34, 36 (2d ed. 2011).

The Law on Land Management Affairs, revised by the Taliban in 2000 and again by the government of Afghanistan in 2008, states that seven types of documents may serve as proof of land ownership: (1) documents of a legal court; (2) a decree issued by the emirate and the prime ministry, if registered; (3) tax receipts; (4) proof of water rights; (5) customary deeds from before 1975, witnessed before 1978; (6) registered title documents; or (7) title documents obtained by court order. *See id.* at 34–36; *An Introduction to the Law of Afghanistan*, Stan. Afg. Legal Educ. Project, at 117–18 (3d ed. 2011); Liz Alden Wily, *Land Rights in Crisis: Restoring Tenure Security in Afghanistan*, Afg. Res. & Evaluation Unit, at 34, 111–12 (Mar. 2003).

The plaintiff has not proffered any document that fits into any of the seven categories listed above. Instead, plaintiff has submitted two letters from the District Governor: one letter that purports to verify plaintiff's grandfather's ownership of the property, and another that purports to verify plaintiff's present-day ownership. Am. Compl. at Ex. A; *see also* ECF No. 25-1 (supplemental exhibit). A letter from a District Governor does not constitute proof of land ownership under the laws of Afghanistan. Consequently, plaintiff has not shown "a cognizable property interest." *Alimanestianu*, 888 F.3d at 1380.

In an attempt to surmount his lack of legally effective documentation, plaintiff invokes the prevalence of informal custom in Afghanistan as the predominant means of facilitating land transactions. Pl.'s Resp. at 9–10. It appears, based on the Court's research, that plaintiff is correct that "formal registration and titling has never been widespread." Erica Gaston & Lillian Dang, *Addressing Land Conflict in Afghanistan*, U.S. Inst. of Peace, Special Rep. 372, at 7 (June 2015); *see also* Yohannes Gebremedhin, *Land Tenure and Administration in Rural Afghanistan: Legal Aspects*, Terra Inst., at 26 (Sept. 2007). Nevertheless, "for the most part Afghan law only recognizes land ownership based on formal documents." Gaston & Dang, *supra*, at 7. The fact that Afghan property law is rarely followed in certain communities puts plaintiff in an unfortunate bind, but not the sort of bind this Court is empowered to resolve by disregarding those laws entirely.

Because plaintiff has not shown a cognizable property interest, the Court does not need to address defendant's argument that the amended complaint fails to meet the specific pleading requirements of RCFC 9(i), *i.e.*, that a party "must identify the specific property interest alleged to have been taken." The Court also does not need to address whether plaintiff's inheritance

agreement with his siblings was valid, even though the siblings did not submit their agreement to a court for approval.

### III. CONCLUSION

For the above stated reasons, the following is hereby ordered:

1. Defendant's motion to dismiss is **GRANTED**.
2. Plaintiff's amended complaint is **DISMISSED**.

The Clerk is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/ Bohdan A. Futey<br>
BOHDAN A. FUTEY<br>
Senior Judge